UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

                Plaintiff,      Criminal Action
                              No. 13-10309-GAO
V.
                              May 11, 2017
DILLAN LETELLIER,             1:09 p.m.

                Defendant.
_____


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210


DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    SUZANNE SULLIVAN JACOBUS, ESQ.
     ANNE PARUTI, ESQ.
4    United States Attorney's Office
     1 Courthouse Way
5    Suite 9200
     Boston, MA 02210
6    617-748-3146

7    FOR THE DEFENDANT:

8    J. W. CARNEY, JR., ESQ.
     J. W. Carney, Jr. & Associates
9    20 Park Plaza
     Suite 1405
10   Boston, MA 02116
     617-933-0350
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open
court before the Honorable George A. O'Toole, Jr., United
States District Judge, United States District Court, District
of Massachusetts, at the John J. Moakley United States
Courthouse, 1 Courthouse Way, Boston, Massachusetts, on May 11,
2017.

The defendant, Dillan Letellier, is present with
counsel.  The Assistant U.S. Attorneys are present.)

01:09         THE CLERK:  Court is in session.  Please be seated.

On the matter of United States v. Dillan Letellier,
criminal action 13-10309.

Would counsel please state your name for the record.

MS. SULLIVAN JACOBUS:  Good afternoon, your Honor.
Suzanne Sullivan Jacobus on behalf of the United States.

MR. PARUTI:  Good afternoon, your Honor.  Anne Paruti
also for the government.

MR. CARNEY:  J.W. Carney, Jr. representing the
defendant.  Good afternoon, your Honor.

01:10         THE COURT:  On December 5, 2016, Mr. Letellier entered
a plea of guilty to the superseding indictment pursuant to a
plea agreement that was offered or in accordance with Federal
Rule of Criminal Procedure 11(c)(1)(C).

My practice has been, and I think it is consistent in
this case, that I reserved accepting the plea until this

1  opportunity to review the submissions with respect to

2  sentencing issues, so on, so forth.

3        So I now announce I will accept the parties'

4  11(c)(1)(C) agreement; and therefore, I accept the plea to the

5  seven counts of the superseding indictment and find the

6  defendant guilty of those offenses.

7        We proceed to sentencing.

8        As I say, there is a plea agreement in which the

9  parties have agreed to a range of potential sentence.  I have a

01:11 10  final presentence report prepared by the Probation Office,

11  which presents information concerning the offenses of -- the

12  offense conduct of the various offense, also presents

13  information about Mr. Letellier personally, and presents a

14  proposed application of the United States sentencing guidelines

15  to determine what the guidelines would recommend with respect

16  to a range of potential sentence.

17        I also have sentencing memoranda from both the

18  defendant and the government, which memoranda include

19  supporting materials.

01:12 20        A starting point for considering a sentence for a

21  criminal defendant is the recommendation that emerges from the

22  guidelines application.  As I say, the presentence report has

23  set forth a proposed application.  In light of the parties'

24  plea agreement, it may not be as critical as in some other

25  cases, but I ask whether there are any issues with respect to

the proposed application of the guidelines or the guideline

range calculated in accordance with the terms of the guidelines

that need to be resolved before we proceed further.

MS. SULLIVAN JACOBUS:  Not on behalf of the

government.

MR. CARNEY:  I don't believe so, your Honor.

I would like to bring one matter to your attention

that's reflected in the addendum.

Throughout the presentence report, the Probation

Officer used the term that applies to the -- terms that apply

to the statute, such as "coerced," "enticed," et cetera.  We

submitted nine objections to the Court.  They all focused

essentially on the defendant's assertion, I submit supported by

the record, that he is certainly guilty of enticing, but would

not be guilty, I submit, in coercing.  That distinction is

important to the defendant and I think to the sentencing.

The ninth objection was to the fact that there was a

photo among his child pornography photos and videos that

reflected sadomasochistic conduct.  The defendant wants to make

clear that that photo was among his collection, if you will,

but he had not realized that that particular photo was part of

it.  The rest of them would generally not qualify as

sadomasochistic conduct.  But he's not in any way undermining

his guilty plea to the child pornography charge.  He just wants

this point brought to your attention.  So I don't know if the

1    Court needs to rule on the objections --

2        THE COURT:  I think that the objections to the first

3    eight I hear you; I think it's more advocacy framing on,

4    perhaps, both sides.  As a matter of law, the behavior with

5    respect to an immature minor might well qualify for the

6    description of coercion if free consent was impossible because

7    of immaturity.  So I'm not sure I would a hundred percent agree

8    with the dichotomy that you would suggest.  It is, nonetheless,

9    not part of the calculation of the guidelines themselves.

01:15 10       With respect to the ninth, whether there is an

11   adjustment for sadomasochistic behavior is of course a

12   guideline adjustment, and I'm looking at the paragraph 57,

13   which refers to guideline 2G2.2(b)(4) and provides for a

14   four-level enhancement.

15       So I'm not sure whether you're arguing that should not

16   have been given or just calling attention to the circumstances

17   of the underlying facts.

18       MR. CARNEY:  I'm calling attention to the

19   circumstances of the underlying offense.

01:17 20       THE COURT:  Okay.

21       MR. CARNEY:  As opposed to objecting to that

22   guideline.  It's a -- I know that sometimes it's an academic

23   exercise when it's an 11(c)(1)(C) plea, but when the defendant

24   brought that specific point to my attention, I wanted to bring

25   it to your Honor.

1    THE COURT:  I understand.  I would make the additional

2    observation that what we are doing at first is to determine

3    what the guidelines would recommend when they are applied in an

4    orthodox manner and are not considering whether there are

5    reasons why adjustments outside -- within the departure

6    authority or outside the departure authority that might be

7    made.

8        I have myself in previous child pornography cases at

9    least expressed some dissatisfaction with the automatic

01:18 10  enhancements that the guidelines call for.  I think in those

11   cases I have nonetheless provided them to determine what the

12   guidelines recommend and then consider other steps to determine

13   what that should be in the overall sentencing project.

14       So I'm inclined to do that as well and accept the

15   guidelines calculation as it is set forth, understanding that

16   that is only the first step of considering an appropriate

17   sentence.

18       MR. CARNEY:  Thank you.

19       MS. SULLIVAN JACOBUS:  Your Honor, can I just put on

01:18 20  the record a couple things just to make sure that the

21   government's position on what the defendant just said is clear?

22       One, the plea agreement -- in the plea agreement, the

23   defendant agrees in this (C) plea to the sadomasochistic

24   enhancement.  That is consistent with what the PSR said.

25       Two, the government has a copy of the image if the

1  Court should wish to see it.  The government believes that

2  particular image clearly qualifies as a sadomasochistic image.

3       Three, the government in its sentencing memorandum,

4  directing your attention to page 14, does not solely rely on

5  that one particular image, which is the image of a prepubescent

6  female lying on her back with the male holding a knife close to

7  her vagina with words "cut me slut hurt me" written in red on

8  her body.

9       Additionally, the government suggests there are other

01:19 10  images that included representative videos that Postal

11  Inspector Services was able to pull from three different

12  computers seized from the defendant's bedroom, and in the pages

13  15 and 16 of the government's sentencing memorandum, I outline

14  what those images were.  And the government would argue that

15  any of those would clearly qualify as depictions of

16  sadomasochistic conduct or other depictions of violence which

17  would warrant the sadomasochistic enhancement.

18       Thank you.

19       THE COURT:  Well, I think that the proposed

01:20 20  application of the guidelines as set forth in the PSR is

21  faithful to the guidelines, and I adopt it.

22       That results in an offense level of 36 and a Criminal

23  History Category of I, and, according to the guideline grid

24  would recommend a consideration of a range of sentence between

25  188 and 235 months.  That is a range above the parties'

1  agreed-to range as set forth in the plea agreement.

2      All right.  So I'll now hear you with respect your

3  specific recommendation for sentence and the supporting reasons

4  for that.

5      Let me just say before we do that, I understand there

6  are no victims' presentations to be made here.  I do have a

7  copy of a letter from Victim A's father that has been

8  submitted.  Are there any other victim-related submissions

9  other than the government's own submission?

01:21 10      MS. SULLIVAN JACOBUS:  No, your Honor, they're not.

11  And under 18 USC 3711, the Crime Victim Rights Act, both the

12  victims' families were notified of today's sentencing hearing.

13      MR. CARNEY:  Your Honor mentioned that you've received

14  memoranda from both parties.  I believe there were a number of

15  attachments --

16      THE COURT:  Yes --

17      MR. CARNEY:  And it's important to my client and his

18  family --

19      THE COURT:  Yes, I have reviewed the attachments.

01:21 20  There are a number of letters.  There's sort of a homemade

21  biography; there's a report from Dr. Ball.  I've reviewed those

22  matters.

23      MR. CARNEY:  Thank you.

24      MS. SULLIVAN JACOBUS:  May I proceed, your Honor?

25      THE COURT:  Yes.

1          MS. SULLIVAN JACOBUS:  Thank you.

2          Your Honor, the impact upon the victims in this

3    case -- and I'm going to focus first on Minor A -- has been

4    profound.  This girl -- and she's a girl.  She's not a young

5    women; she's not a grown woman.  She was an eighth grader, as

6    was Minor B.  And I'm referring to them throughout my

7    sentencing memorandum and throughout the process of this case

8    as Minor A and Minor B, but both of those girls' names have

9    been disclosed to defense, and the defendant is well aware of

01:22 10   who he not only communicated online with but who he traveled

11   from Maine to Massachusetts on multiple occasions as it relates

12   to Minor A and on one occasion which it relates to Minor B, and

13   engaged in sexual intercourse with these two 14-year-old eighth

14   grade girls.

15         I would suggest to the Court using the word "profound"

16   is probably not even fully encapsulating the impact that Dillan

17   Letellier has had on that then 14-year-old girl.

18         Within two days of disclosing to the local authorities

19   in August of 2013 what this defendant and other individuals had

01:22 20   done to her, that 14-year-old tried to take her life by

21   overdosing on pills.  "I just don't want to face high school

22   knowing the torture I might go through.  I took painkillers so

23   it wouldn't hurt.  It hurts like hell."  That was a portion of

24   the words that were contained on Minor A's suicide note that

25   she left for her parents in her bedroom on the day that she

tried to take her life a couple of days after reporting to the authorities. That note was provided to defense, your Honor.

The impact statement that was submitted on behalf of Minor A from her father in part states, "Completely, utterly and in every respect and waking moment, devastated us."

"In short, the action of Dillan Letellier has had a lifetime, profoundly negative impact on my daughter, her brother, my wife, and myself."

The Court has had an opportunity to review the impact statement in its entirety that was submitted by Minor A's father, and I've also included it as an attachment in the government's sentencing memorandum.

It is clear from the facts of this case, which the defendant now stands convicted of, that he is a hands-on child sex offender who victimized two 14-year-old girls. He manipulated and preyed upon their young, impressionable minds for his own deviant sexual gratification.

Dillan Letellier lied about his age and pretended to be a 17-year-old high school student when, in reality, he was a 29-year-old fully grown man, college graduate, and married. He was twice the age of these two victims when he engaged in his coercive and enticing actions on them.

He also possessed thousands of images and videos of child pornography, including children under the age of 12. And some of that child pornography dated back years to 2004

1    according to the forensic examination and analysis that was

2    done by the lead agency, United States Postal Inspection

3    Services.

4         I would suggest to the Court that the evidence of

5    Mr. Letellier's manipulation is very strong.  He convinced both

6    of these young girls to sneak out of their homes at night,

7    unbeknownst to their parents or guardians, and meet him after

8    he traveled hundreds of miles from Maine to Massachusetts.

9         This is a man who went on to TeenSpot.com, an internet

01:25 10   site, and met these two young girls separately and pretended to

11   be a 17-year-old high school student all the while.  In his own

12   TeenSpot profile, your Honor, he lists a phony age of 17, a

13   phony year of birth of 1996.  And he continues that fictitious

14   online persona when he's communicating through Skype and

15   through text with these girls, and he also continues this

16   fictitious personality and persona when he meets with them

17   individually and engages in sexual intercourse.

18        This is a college graduate who clearly knows right

19   from wrong, yet, he has been trying throughout this process,

01:26 20   your Honor, to place the blame on the minor victims' shoulders.

21   And the blame, I would suggest to the Court, falls squarely on

22   one man's shoulders, the defendant, Mr. Letellier.

23        Let's be very clear, your Honor.  The evidence has

24   shown that the defendant knew exactly what he was doing when he

25   communicated online separately with Minor A and Minor B.  The

evidence has shown that he engaged in a period of June 27th

through August 24th of 2013 when he was text messaging with

Minor A over that three-month period of time, the forensics

have shown there was approximately 1,999 times that there was

text messaging between those two people.

With Minor B, your Honor, it was much more limited

period of time.  In fact, it was only a 36-hour window.  The

defendant met that young girl online as well, and they engaged

in text messages, approximately 199, over a 36-hour period

between October 1st and October 2nd of 2013.  In fact, the

defendant even communicated to Minor B that he was leaving the

country within a day or so, so he wanted to meet with her

before he left.  And that evidence is corroborated by the fact

that when the search warrant was executed approximately a day

later, there was a passport and a plane ticket in the

defendant's bedroom indicating that later that same day the

defendant was to leave for the Dominican Republic.

This evidence in this case, your Honor, I would

suggest to the Court, shows a pattern by the defendant.  It

wasn't isolated to a day, it wasn't isolated to a short period

of time, and it wasn't isolated to one girl.

The texts between the defendant and his two minor

victims were is sexually graphic.  The defendant texted Minor A

his preference of middle schoolers.  He told Minor A through

text what he would do sexually to her.  And after he engaged in

sexual intercourse with her the first time, he texted her very graphic text messages about how good the sex with her was and what he would do with her the next time the two of them got together to engage in sexual intercourse.

He also texted Minor A, your Honor, that he had previously engaged in sexual intercourse with three seventh graders a year earlier in 2012, and that he would go as young as a 12-year-old, he being this defendant.

He knew how old Minor A was, and he knew how old Minor B was when he communicated online with them. In fact, Minor A's TeenSpot profile lists her age as 14.

This defendant also provided Minor A with alcohol on both occasions that he drove from Maine to Massachusetts where she left her home, walked a short distance away, got into his car. He drove her to a nearby area, including a state park, where he then engaged in sexual intercourse with her.

He also instructed Minor A to perform specific sexual acts on herself. He directed her what to do and how to do it. He then asked her to take photos of it and send it to him through the internet.

Your Honor, the government believes a 14-year period of incarceration, which reflects the high end of the range as contemplated in the plea agreement that we've submitted to the Court that the Court has now accepted, we would suggest and we believe that a 14-year period of incarceration is warranted in

this case, and it would account for the 3553(a) factors that
the Court must consider, including the nature and circumstances
of the offense, which in this case, I would suggest to the
Court, are egregious.

     The defendant knowingly and intentionally preyed upon
the vulnerabilities of two junior high school girls and did so
by coercing, enticing, and inducing those girls to meet with
him and engage in some type of sexual activity.  He went
further than that.  He isn't somebody that just -- just
communicated online, which has been argued in many other cases,
as if that was to minimize the criminal behavior of somebody,
but this defendant took it additional steps, because he then
met in person with these two girls, on two occasions with Minor
A, and on one occasion with Minor B, where he engaged in sexual
intercourse.  And he also attempted to entice and coerce the
undercover United States Postal Service inspector who assumed
the identity of Minor A on the night Minor A went to the police
in August of 2013 and disclosed to them what had happened.  The
text messages between the defendant and the undercover were 208
in total, and that was between a period of August 24, 2013 to
September of 2013.

     As I indicated to the Court, I think it's very
important, your Honor, to understand that this defendant was
more than twice the age of these two girls.  These girls were
impressionable, young high school students, whereas this

1    defendant was a grown man who was college educated.

2         I also suggest to the Court that the texts and the

3    communications that this defendant had with his victims

4    demonstrate that he knew exactly what he was doing.

5         In addition to being graphic, in addition to the

6    fictitious online personality and the lies that the defendant

7    represented on his TeenSpot profile, we have what I've referred

8    to in my sentencing memorandum, your Honor, as the Hershey

9    letter.  And the Hershey letter has been attached to the

01:31 10   government's sentencing memorandum.

11        In that case, this defendant, as it relates to Minor

12   A, and after he had engaged in sexual intercourse with her on

13   two occasions, he and Minor A created a fictitious letter that

14   Minor A was supposed to give to her parents and have put in the

15   mailbox for her parents.  This letter, your Honor, I would

16   suggest to the Court, was done so that this defendant could

17   have yet another opportunity to be with Minor A.  But because

18   he had car troubles and he couldn't get back down to

19   Massachusetts, this was a way for him to entice and coerce her

01:32 20   to go up to the State of Maine.  That Hershey company letter is

21   completely phony and fictitious.  In it, the defendant told

22   many lies.  Among other things, he lies about who he is and

23   indicates that he's employed by this company and he is actually

24   the Northeast regional -- regional coordinator for the

25   Northeast region 9.  That doesn't exist, your Honor.

The defendant wanted Minor A to come up and participate in what he describes as a unique experience. The Hershey track and field program selects a small number of students aged 13 to 15 to be evaluated by professional coaches and trainers.

This was supposed to occur over a long holiday weekend, the Labor Day weekend, in 2013. And the defendant directed Minor A how to fold the letter, how it should be placed in the mailbox, and additional specific instructions to Minor A so that it would appear genuine to Minor A's parents, who actually received it. And luckily for the minor and luckily for this case, your Honor, Minor A's parents happened to come upon the family computer that was left on by Minor A, and they saw in it a reference to Hershey company letter, and they had already received the Hershey letter.

Shortly thereafter, they confronted their daughter, and thereafter she told them what had happened and her father took her to the local police department, and this is how this case unfolded, your Honor.

But that letter shows you the steps and the manipulation and how far this defendant will go to try to get access to this 14-year-old girl, and that cannot be underemphasized, your Honor.

If you're looking at the history and the characteristics of the defendant, I also suggest to you that

1   the defendant in his sentencing memorandum is placing the blame

2   or trying to place the blame on Minor A relating to this

3   Hershey company letter, as if this is all her fault and he had

4   nothing to do with it, and that's not the case.

5         I know that's an objection that's listed to the PSR by

6   the defendant and that was number 4, and the government has

7   also addressed that in page 7 of our sentencing memorandum.

8         By the defendant's own statements to the Probation

9   Department and the PSR interview, your Honor, and by the

01:34 10   defendant's mother's statements to Probation when she was

11   interviewed in connection with the preparation of the

12   presentence report, this defendant has been involved in child

13   pornographic criminal activity for at least ten years before

14   this instant conduct, which, by my calculations, would have

15   this defendant at age 19 when that was starting.

16         In 2003, the defendant admitted to law enforcement up

17   in Maine that he had access to websites containing child

18   pornography.  He was not charged with anything as it relates to

19   that, but he agreed to participate in treatment.  But the

01:35 20   treatment was related to child pornography and not sex

21   offender-specific treatment.

22         I would suggest to the Court, that treatment did not

23   deter the defendant at all from continuing to possess child

24   pornography, nor did it deter him from progressing to become a

25   hands-on sex offender, which is what we are dealing with now.

1    I would suggest to the Court that the defendant has

2    tried repeatedly not only to blame the victims but to place the

3    focus away from where it should be in this case.

4    In this case, your Honor, the defendant needs, must,

5    and should be held accountable for these egregious acts.

6    In addition to the 3553(a) factors of nature and

7    circumstances and history of the characteristics, I would

8    suggest to the Court that your sentence needs to reflect the

9    serious nature of his heinous and repeated criminal conduct.

01:36 10    It must promote respect for the law.  It must afford adequate,

11    general, and specific deterrence, and it must protect the

12    public from future crimes of the defendant.

13    The defendant stands here before you, your Honor, and

14    he is going to recommend that you impose the mandatory minimum

15    sentence of ten years.  And I would suggest to you that that is

16    not appropriate in this case.  And in the sentencing memorandum

17    that I submitted to the Court, I also outlined for the Court

18    the fact that there were two other defendants that were

19    stand-alone defendants.  All three of these men have been

01:36 20    stand-alone defendants, but the common denominator was Minor A.

21    One of them was Mr. Stoloff.  In that case, Judge Saylor

22    imposed the joint recommendation of a 10-year sentence of a (C)

23    plea.  But I suggest to the Court this is what Mr. Letellier

24    wants you to do, to also impose the exact same sentence.  And I

25    would suggest to the Court that that is not appropriate in this

case.

Mr. Stoloff's case was a one-count indictment. It was one count of coercion/enticement with Minor A. There was no evidence of child pornography recovered in Stoloff, where there was with the second individual, Mr. Gage. There was no physical assault of Minor A in Stoloff, which there was with Mr. Gage; and Stoloff's guideline sentencing range was lower than Mr. Letellier's, 108 to 135.

Mr. Letellier has a seven-count superseding indictment with two minor victims, a third victim who's been not -- he's not been charged with, but there's a reference that he tried to communicate with a third individual. That person didn't want to proceed and is not part of the charged offenses in this case.

Mr. Letellier pretended to be a 17-year-old individual, whereas Mr. Stoloff and Mr. Gage did not. Mr. Letellier went further by creating a phony invitation.

Yet, Mr. Letellier wants you to put him in the same position or have at least imposed the same sentence as that that was imposed in Stoloff's case.

I bring up Mr. Gage as well, because that case was a stand-alone case where the defendant was charged with two counts of coercion, one of coercion and one of attempted coercion. That involved only one minor victim, but it was on more than one occasion that Minor A and Mr. Gage met.

In that case, there was evidence of child pornography by way of production, but he was not charged with that offense, but that would have given him a 15-year or 180-month mandatory minimum sentence. In that case, the government recommended the 15 years. It was a (C) plea range, and the defense was given the opportunity in that (C) plea to argue for 13 years, and that's what Judge Saylor imposed, 13 years. But I would suggest to the Court, as the Court is well aware, each case stands alone, but I think it's important to point out because of the overlap with the same victim involved where the government believes the appropriate sentence is for the sentencing range.

And for the reasons that we've outlined in our sentencing memorandum, the government believes that a period of 168 months, or 14 years, of incarceration is warranted for Mr. Letellier. In addition, five-year mandatory minimum period of supervised release; a $700 mandatory special assessment; restitution in the amount of $2,400 to Minor A, which I will tell the Court that was the same amount of restitution that was ordered both in Mr. Stoloff's case and Mr. Gage's case as it relates to Minor A; forfeiture, as outlined in paragraph 7 of the plea agreement, and I have the preliminary order of forfeiture that I believe was previously filed by the Forfeiture Unit of my office for the Court, but I have that which I would ask the Court to sign and endorse.

1    In addition, the plea agreement calls for no contact

2   directly or indirectly with either Minor A or Minor B during

3   the period of incarceration and the period of supervised

4   release.

5    And in addition, your Honor, I have the image or

6   images if the Court wishes to review them.

7    For those reasons, your Honor, I would ask the Court

8   to impose the government's recommended sentence, and I thank

9   you for your time.

01:40 10   THE COURT:  Mr. Carney.

11   MR. CARNEY:  Thank you, your Honor.

12    My practice has been, as your Honor knows, to submit a

13   sentencing memorandum that sets forth the core arguments that I

14   would make at sentencing, and I don't try to belabor them at

15   oral argument in support of that sentence.

16    I am recommending that the Court impose the 10-year

17   sentence on Mr. Letellier.  I submit there are some important

18   factors in this case, and there are considerations related to

19   the two other cases that the government has spent a lot of time

01:40 20   talking about, and I want to highlight these.

21    I want to alert the Court also that it has been very

22   important for my client to have the opportunity to address you

23   when I am done, and I know he has a number of points he wants

24   to make to you, and I'll try to limit mine to the points I'm

25   making.

1       First of all, it is an important consideration that

2  the defendant has no prior record.  It's taken into account by

3  his being categorized as a Category I offender, but it's also

4  significant because when one looks at the rest of his life,

5  it's normal and pretty exemplary.

6       The reason that I encouraged his family to submit

7  material to me that I could give to your Honor is to humanize

8  my client so that your Honor would have a chance to see the

9  life he led, the people he was with, the things he did that

01:42 10  constitute 99 percent of his life, as opposed to the

11  recitation, understandably, of the underlying conduct that

12  brings him here.

13       He has a great deal of support, and I want to

14  introduce to your Honor -- and could you raise your hand when I

15  mention your name -- people who are here:  His wife, Mercy; his

16  mother, Tonia; his grandmother, Joanne; his father, Samuel; his

17  uncle, Alfred; a long-time family friend, Rick; and finally, a

18  college friend, Brandon.

19       When the sentencing was scheduled earlier, there were

01:43 20  also three other people, the defendant's brother, aunt, and

21  mother-in-law, who would have been able to attend on that date

22  but are unable to attend on this date.

23       When you look at all of those materials submitted as

24  exhibits to my memorandum, it's apparent, I submit, that Dillan

25  Letellier is not the monster that the government wants the

1    Court to look at him as.  He simply isn't.

2         My client has authorized me to inform the Court of

3    something, which I had not learned except almost by accident in

4    having a conversation with my client.  I knew that his father

5    was not a meaningful presence in his life, but he was somewhat

6    of a presence, and the way I found out about the fact that I'm

7    going to tell you is my client asked me if he could be

8    sentenced to the federal facility at Devens.  And curious, I

9    asked him why?  He said, That's where my father served his

01:44 10   federal sentence.  And I asked him, What did he do time for?

11   Possession of child pornography.

12        And I'm not going to be an armchair psychiatrist or

13   psychologist, but if the person who is supposed to be your role

14   model is someone who's engaging in this type of conduct, I

15   won't talk about apples falling far from the tree.

16        It was important that Dylan be evaluated by Dr. Ball,

17   and she specializes in evaluating sex offenders.

18        She concluded, after doing a thorough evaluation, that

19   the defendant poses a low risk of reoffense and very good odds

01:45 20   for treatment.  She also noted his remorse of engaging in this

21   conduct.  So that in terms of factors for a court to look at, a

22   low risk of reoffense, good odds for treatment, and remorse, I

23   would hope would be just the profile that the Court would want

24   to see in a person who's being sentenced.

25        The last point I want to comment on are the two cases

1    that the government talked about.

2         Every one of these cases allows a prosecutor to use

3    very hyperbolic language to describe the encounters.  There's

4    no dispute about the absolute inappropriateness and criminality

5    of having consensual sexual relations with a person who is

6    underage.

7         If this were in the superior court, the defendant

8    would have pleaded guilty to two counts of statutory rape,

9    because no matter how the government wants to carve the

01:46 10  language, it's quite apparent by the text messages exchanged

11   that there was no force, there was no violence, there was no

12   threat of violence, there was no coercion.  And the reason I

13   say that is in some instances, there is coercion, there is

14   violence, there are threats of violence.  And I'm just asking

15   the Court to make the intellectually honest distinction, as I

16   know you will, between be someone who does engage in violence

17   and someone who does not.

18        The government in her -- the prosecutor in her

19   sentencing memorandum kept repeating time after time that the

01:47 20  defendant hid his age from the girls, as if that's

21   independently a crime.  Just like the scheme that he concocted

22   about, Hey, you can say you're going to some sports tournament

23   as a way to see her, as opposed to simply saying, Tell your

24   parents you're going to the library.

25        It's instructive to read the prosecution's sentencing

1  memoranda for the two other men who were involved with Minor A.

2  It's the same hyperbolic language in both, but the facts are

3  different.

4       I'll start with Gage.  He did not hide the fact from

5  Victim A that he was 42 years old.  As if that's a mitigating

6  factor to the prosecution.  But what the government emphasizes

7  in this case involving Gage is he videotaped the sex acts with

8  Minor A.  Producing child pornography is a minimum mandatory

9  15-year sentence, and the government forgoed that

01:48 10  opportunity -- if that's the word, perhaps it's forewent -- but

11  in any event, the government chose not to charge him with

12  producing child pornography, even though it is clear that he

13  did by videotaping sex acts with Minor A.

14       The government's sentencing memo regarding Gage talks

15  about the fact that he communicated his desire to participate

16  in a gang rape of her.  He told her to use a fictitious name.

17  He told her that he intended to anally rape her the next time

18  he got together with her.  He preyed upon his young victim and

19  manipulated her young, impressionable mind for his own perverse

01:49 20  sexual gratification, et cetera.  And that defendant got a

21  13-year sentence for multiple acts of sexual intercourse with

22  Minor A.

23       Mr. Stoloff in his sentencing memorandum filed by the

24  prosecution, the prosecutor emphasizes that the text messages

25  of Stoloff emphasized he wanted her to wear a short skirt,

where to meet to have sex where the two had previously met,

told her to wear sexy panties and all these other details, and

his intention was clearly to meet with her again by his text

messages.  But the government asserts he only had sexual

relations with her on a limited basis.

I don't bring this information out to try to just

compare defendants who undoubtedly have differences, but to

make the point that when one looks at individual sentencing,

it's not hyperbolic language that can be applied to every

single case of this nature, every single one.  Rather, it's

looking at the individual characteristics of this defendant,

Dillan Letellier, and consider those characteristics in

imposing a sentence.

A ten-year sentence might be viewed as draconian, but

it is the minimum the Court can apply.  And given the absence

of any coercion, horrible acts of threatening what is going to

happen to Minor A, like be gang raped or be anally raped

against her consent and things like that, it's just important

to put these characteristics of Dillan Letellier in their

place.  And I ask the Court to impose a sentence of ten years

with five years of supervised release.  That would be

appropriate punishment.

THE COURT:  Mr. Letellier, you have the opportunity to

make a statement if you wish.  You don't have to, but this is

your chance to do so if you wish.

```
 1              (Defendant conferred with counsel.)
 2              MR. CARNEY:  Thank you, your Honor.
 3              THE DEFENDANT:  I'm going speak.
 4              MR. CARNEY:  No, just stand when you're going to
 5       speak.
 6              Thank you, your Honor.
 7              THE DEFENDANT:  Thank you for this time.
 8              I don't have anything prepared; sorry for that.  That
 9       was a choice I made because I wanted everything to be said to
01:53 10       be said by me in this moment, because I didn't -- I don't
11       necessarily know what I want to say, but it's got to come to
12       me.
13              I mean, thinking about this moment, I wanted to talk
14       about many things.  I've wanted to talk about, you know, why
15       I'm here, what happened, and I'm not sure if that's
16       appropriate, but, I mean -- so this has been a long time
17       coming.  You know that.  It's been 43 months now, a little
18       more.  And I've had a lot of time to think about things.  A lot
19       of time to make reflections and to find out things about myself
01:54 20       I didn't already know, you know, find out things about other
21       people I didn't know.  And I'm not -- I'm not the person that
22       Ms. Sullivan described.  I'm not that person.
23              The decisions I made: very wrong, regrettable
24       decisions.  And the way of thinking was wrong.  And that's more
25       of a -- that's more of the problem, was the way of thinking.
```

1   It was the making rationalizations, the not considering the law

2   or, you know, relationships I have with my family or respect of

3   the minors or the minors' families.  So not making any of those

4   considerations made what I did very wrong.

5           So when I walked in the courtroom, you know, I got to

6   see my family.  They're here.  And so this is where it gets

7   hard because, you know, seeing them here, it means a lot.  It

8   means more than anything.  These are the people -- these are

9   the people who know who I am, and these are the people who have

01:56 10  already forgiven me.  Yeah, I may have lost some trust, but

11  it's not going to be hard to regain it with them, because,

12  again, they know who I am.  And I'm not -- I'm not that person.

13          This behavior -- this was the exception.  This was

14  something that I'm not proud of, in no way.  I'm ashamed.  You

15  know, I'm terribly ashamed.  But this behavior, this is the

16  exception.  Because I'm not -- I'm not -- you know, if you look

17  at this case, if you look at the facts of the case, you might

18  think, Well, this person is a selfish person.  This person

19  disregards the law.  This person doesn't care about anything

01:57 20  except himself and his own gratification.  But that's not true.

21  It's not true.  This happened.  I did these acts, but they

22  don't define who I am.  Ordinarily, I'm a very kind, honest

23  person, very considerate, very respectful, very trustworthy,

24  and very trusting.  I trust people.  When I encounter new

25  people, I inherently trust them maybe because I feel as though

that, you know, people are like me, and if people are like me,
then I should be able to trust them.  I'm not talking about --
I'm not talking about what happened here.  I'm not talking
about this case; I'm talking about my true self, my ordinary
self other than this.

I had to lie to do this.  I had to pretend that -- not
that I was someone else, but I had to pretend that I was a
teenager to make this okay.  And thinking about it, if I was a
teenager, it probably would be okay.  That's not the point, but
that's what I had to tell myself.  That's what I had to say to
myself to make this okay, but otherwise it wouldn't be okay.
It's not like I shared this with people.  It's not like I
was -- again, I told you, I'm not proud of this; I'm ashamed of
this.

This isn't something that I wanted anyone else to know
because of that shame because of that guilt.  But I'm glad --
I'm glad that I've been since prosecuted by my country.  I'm
glad of it because now I can put this to rest.  Now I can put
this behind me.  Now I can look forward and work on changing
and adjusting the problems that caused this.  And I have been.
In the 43 months, I have been.  I've made changes, dramatic
changes.

I've turned a bad habit into a non-habit, and I've
thought about a decent analogy, like smoking cigarettes, you
know.  I imagine smoking cigarettes is a bad habit; you do it

every day.  And if you think about, you know, in the somewhat
recent past, smoking cigarettes was allowed in jails and
prisons.  So imagine that I was in that place and I was
continually able to smoke cigarettes.  I stopped smoking
cigarettes.  It's an analogy, but I've since changed my habits,
and in turn changed my way of thinking.  And I know I'm capable
of change.  I know I am.

        This is a somewhat interesting example, but it
explains something about me.

        When I was really young, my mother had a boyfriend,
and he told me and my brother like, Oh, it's good luck to pick
your feet up when you're in a car and you travel over a train
tracks.  It's good luck; do it.  Okay.  Like a superstitious
kind of thing.  That stuck with me for so long, okay.  It stuck
with me from when I was, like, eight, nine years old up until I
was, like, 13.  And every day on the bus, I'd be going to
school and I knew when the train tracks were coming and I kept
my feet planted to the ground because of this idea that this
man put in my head.  But then I realized, This is ridiculous.
Why am I thinking about this?  Why am I making these ridiculous
thoughts?  I don't want to do this anymore.  I want to change
this.  And over time I made that change, you know.  It
wasn't -- it's not like a light switch, it wasn't an on/off
switch, but I did.  And my goal was to one day look in the rear
view or look behind me and realized that I had traveled over

1    train tracks and not have any problem with them.  And I

2    achieved that.  I achieved that.

3         Eventually this way of thinking is going to be put in

4    the rear view and I'm going to live my life and I'm going to

5    one day realize, Oh, my God, there was a time when I could have

6    had a bad thought in my head but I didn't, like, you know,

7    finally, finally that's left me.  And it's going to happen.

8    It's going to happen.  It's going to happen while I'm

9    incarcerated.  It's going to happen.  So when I get home,

02:02 10   there's not going to be any problems.  There's not going to be

11   any problems.  I'm not going to come here again.  I'm not going

12   to be here.  I'm not going stand in front of you and be judged

13   by you, your Honor, or any judge, again.  Not, I'm just not.

14         That's basically it.

15         Thank you.

16         THE COURT:  All right.

17         MS. SULLIVAN JACOBUS:  Your Honor, do you want to see

18   the images that I --

19         THE COURT:  No, they've been described in the

02:03 20   submissions.  I'm confident I understand what they are.

21         As we noted, the methodology of deciding on an

22   appropriate sentence is first to consider what the United

23   States sentencing guidelines would recommend in the particular

24   circumstances of a given case, and that is done by addressing

25   the important factors in the case and assigning them the

scoring that occurs in the guidelines regime, and then, when added up, consider that recommendation but in conjunction with a number of other considerations. And those considerations are set forth in what we refer to as the sentencing statute. It's 18 U.S. Code Section 3553.

In this case, what the guidelines recommend is above what the parties have recommended in their plea agreement that has been submitted and accepted. So that puts it to one side because I said I would accept the parties' range as a range for appropriate sentencing, that puts aside the guideline recommendations.

So we turn to the factors that the statute enumerates, and there are a number of them, and actually, sometimes there are more that apply and sometimes fewer, and in this case, as I read them, most of them apply, I think.

And the first consideration is the nature and circumstances of the offense or the offenses. And I don't want to belabor the point. I think I substantially agree with the prosecutor's characterization. This behavior was directed at more than one vulnerable victim, was premeditated, it required extensive preparation and extensive execution. It was, apparently, time intensive. One of the things that stands out as a feature of this case is the Hershey letter as a signal, as a kind of sign of how determined the defendant was to accomplish these offenses. So it was all of those things, and

it was predatory.  Those are, I think, the salient nature and
circumstances of the offense.

The sentence imposed should reflect the seriousness of
the offense, provide just punishment for that, and promote
respect for the law by doing so.  Those two considerations
dovetail, it seems to me, in this case.  The sentence should
provide adequate deterrence to criminal conduct, both with
respect to an individual defendant who is deterred from repeat
offending, but also to others who might be contemplating
element bargaining on a similar course of conduct, that they
will be warned of the serious consequences that follow.  And
therefore, another factor, to protect the public from future
crimes of the defendant, but also from other offenders.

Another important factor in this case is one that I
think is not always cited but is the need to provide the
defendant with educational training, medical care, other
correctional treatment in an effective manner.  I think
Dr. Ball's report indicates that there is some pathology, and I
think an institutional setting may be an appropriate place
where some of those issues can be addressed in a long-term
environment.

I take note of the statutory factor of avoiding
unwarranted disparities.  It's always difficult to compare
cases.  Every case is unique.  There are always cases with
features that are similar and features that are different.  So

I won't say that the cases that are cited, the Stoloff and Gage

cases, are perfect comparators.  They are, to some degree,

markers that should be noted and considered.

And finally, this is more or less -- less

controversial, I guess, less significant factor, the need to

provide restitution to any victim.  And the parties in their

plea agreement have agreed to a restitution amount.

But for all those reasons, I am persuaded that the

government's recommendation is an appropriate one and within

the range suggested by the parties at the high end.

Apart from what I've already described, I think a

feature that perhaps distinguishes it from other cases, but

perhaps not, is the sort of separate offense of collection of

child pornography.  Obviously, they're interrelated conduct,

but they are somewhat different in kind, and I think that -- if

there was something that was -- I was uncertain about, I think

it's the addition of that offense and the conduct underlying it

that pushes me to the top end of the guideline range -- not the

guideline range -- the parties' suggested range.

So I will impose a sentence of 168 months, consistent

with the range in the plea agreement, and five years of

supervised release.

Mr. Letellier, then, if you would stand, please.

Dillan Letellier, on your conviction of these offenses

and pursuant to the Sentencing Reform Act of 1984, having

considered the sentencing factors enumerated in 18 U.S. Code

3553(a), it is the judgment of the Court that you be and hereby

are committed to the custody of the Bureau of Prisons to be

imprisoned for a term of 168 months.  This consists of equal

terms of all the counts of conviction, all to be served

concurrently.

Upon the completion of your term of imprisonment and

your release from imprisonment, you shall be placed on

supervised release for a term of five years.  This is equally a

five-year term on each of the counts of conviction all to be

served concurrently.

Within 72 hours of your release from the custody of

the Bureau of Prisons you shall report in person to the

district to which you have been released.

It is further ordered that you make restitution in the

amount of $2,400 for the benefit of Minor A.

Restitution shall begin immediately according to a

payment schedule, or rather in accordance with the federal

Bureau of Prisons Inmate Financial Responsibility Program while

you are incarcerated.

All restitution payments are to be made to the clerk

of this court for transfer to the appropriate recipient.

You shall notify the United States Attorney for this

district within 30 days of any change of any mailing and

residential address that occurs while any portion of the

restitution remains unpaid.

There is no indication of an ability to pay a substantial fine, I will not impose a monetary fine.

I do grant the government's motion for a preliminary motion of forfeiture. The property is identified in the motion.

While you're on supervised release, you shall comply with all the standard conditions that pertain to that status. Those conditions are set forth in the United States sentencing guidelines at Section 5D1.3(c). They're incorporated now by reference but they will be incorporated in the judgment at length.

In addition to those terms and conditions you shall comply with the following conditions of supervised release:

You may not commit any other federal, state, or local crime.

You must not unlawfully possess any controlled substance, and you shall refrain from the unlawful use of any controlled substance and submit to a drug test within 15 days of your release from imprisonment and at least two periodic drug tests thereafter, not to exceed 104 tests per year. All this may be directed by the Probation Office.

You are to cooperate with the collection of a DNA sample at the direction of the Probation Office.

You shall comply with the requirements of the Sex

Offender Registration and Notification Act, Title 42, U.S.

Code, Section 16901 and following as directed by the Probation

Office, the Bureau of Prisons, or any state sex offender

registration agency where you reside, work, or are a student or

convicted of a qualifying offense.

It is a condition of your supervised release that you

pay the balance of any restitution in accordance with the

appropriate schedule.  And you're prohibited from incurring new

credit charges or opening additional lines of credit without

the approval of your probation officer while any financial

obligations remain outstanding.

You must provide the Probation Office with access to

any reasonably requested financial information, which

information may be shared with the Financial Litigation Unit of

the United States Attorney's Office.

Pursuant to the Adam Walsh Child Protection and Safety

Act of 2006, you shall register as a sex offender not later

than three business days from release and keep the registration

current in each jurisdiction where you reside, are employed,

are a student.  And must not later than three business days

after each change in any -- in your name, residence,

employment, student status, appear in person in at least one

jurisdiction in which you are registered and inform that

jurisdiction of all the changes in your information.  Failure

to do so may not only be a violation of this condition of

1 supervised release, but also may be a new federal criminal

2 offense punishable by up to ten years of imprisonment.

3 You shall read and sign the offender notice and

4 acknowledgment of duty to register as a sex offender.

5 If directed to do so by your supervising Probation

6 Officer, you are to participate in a sexual specific evaluation

7 or sex offender specific treatment conducted by a sex offender

8 treatment provider who shall be trained and experienced in the

9 treatment of sexual deficiency and follow the guideline

02:16 10 practices established by the association for the treatment of

11 sexual abusers. This evaluation may include psychological and

12 physiological testing which may include polygraph testing and

13 the visual reaction time assessment. You must disclose any

14 previous sex offender or mental health evaluations to the

15 pretreatment provider.

16 As noted, you may be required to submit to periodic

17 polygraph testing as a means to ensure that you are in

18 compliance with the requirements of your supervision or

19 treatment. When submitting to a polygraph exam, you do not

02:17 20 waive your Fifth Amendment rights, and your exercise of any

21 Fifth Amendment rights will not give rise to a violation

22 proceeding.

23 The results of a polygraph examination may not be used

24 in evidence in court to prove that a violation of community

25 supervision has occurred, but the results may be considered in

1    a hearing to modify release conditions and/or could initiate a

2    separate investigation.

3          With respect to the computer use.  You must allow the

4    installation of computer internet monitoring software or

5    approved internet-capable devices, but you may still use a

6    computer for work purposes that has been previously approved by

7    the Probation Office.  Programs used will be designed or

8    identified by the Probation Office for viewing, downloading,

9    uploading, transmitting, or otherwise using of any images or

02:17 10   content of a sexual or otherwise inappropriate nature.

11         You must not attempt to remove or otherwise defeat

12   such systems and must allow the Probation Office to examine any

13   computer and receive data from it at any reasonable time.

14         You must advise anyone using the monitored internet

15   capable devices that those devices are being monitored by the

16   Probation Office.

17         You must not possess or use any computer or

18   internet-capable device without the prior approval of the

19   Probation Office.  And any device may not be used to knowingly

02:18 20   access or view sexually explicit material as defined in 18 US

21   Code Section 2256(2)(a).

22         You must disclose all account information relative to

23   internet access, social networking, and e-mail, including user

24   names and passwords, to the Probation Office.

25         You must also, if requested, provide a list of all

software or hardware on your computer, as well as telephone,

cable, or internet service provider billing records and any

other information deemed necessary by the Probation Office to

monitor your computer usage.

You must not knowingly have direct contact or contact

through a third party with children under the age of 18, unless

previously approved by the Probation Office or in the presence

of a responsible adult who has been approved by the Probation

Office and who is aware of the nature of your background and

current offenses of conviction.

You must not knowingly have any contact with the

victims of these offenses without prior approval of the

Probation Office.  This includes letters, communication

devices, audio or visual devices, visits, social networking or

other means of contact.

You must consent to a third-party disclosure to any

potential employer concerning computer-related restrictions

that are imposed on you unless excused by the Probation Office.

You're not to be employed in any capacity that may

cause you to come in contact with children, except under

circumstances approved in advance by the supervising Probation

Officer.

You must not participate in any volunteer activity

that may cause you to come in direct contact with children,

except under circumstances approved in advance by the Probation

1    Office.

2            Prior to accepting any form of employment, you must

3    seek the approval of the Probation Office in order to allow the

4    office the opportunity to assess the level of risk to the

5    community you may pose if employed in that particular capacity.

6            With respect to any of the programming or treatment

7    requirements of these conditions, you may be required to

8    contribute to the costs of evaluation, treatment, programming,

9    or monitoring based on your ability to pay or the availability

02:20 10   of third-party payment.

11           As I've noted, I will not impose a monetary fine in

12   addition to the restitution.

13           There is a mandatory assessment of $700 which

14   represents $100 for each of the seven counts of conviction.

15   That sum is due forthwith.

16           Mr. Letellier, in your plea agreement, you limited or

17   restricted your ability to appeal any of the judgments of the

18   Court with respect to sentencing.  To the extent you have any

19   right to appeal upon your waiver, you must exercise the right

02:21 20   to appeal by filing a notice of appeal with the clerk of this

21   clerk within 14 days of the date of the judgment.

22           The defendant is remanded to the custody of the

23   marshal.  We'll take a recess.

24           THE CLERK:  All rise.

25           MS. SULLIVAN JACOBUS:  Your Honor, just for the

record, because the defendant has been sentenced on the
superseding indictment, the government would orally move to
dismiss the underlying indictment.

THE COURT:  Assuming there's no objection.

MR. CARNEY:  Correct.

THE CLERK:  All rise.

(Court adjourned at 2:22 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled matter to
the best of my skill and ability.

/s/Debra M. Joyce                    September 27, 2017
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter